AUSA: David A. Markewitz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MORDECHAI BAR,<br><br>Defendant. | 24mj2082<br><br>**SEALED COMPLAINT**<br><br>Violations of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), 841(b)(2), 846; 18 U.S.C. § 2<br><br>COUNTY OF OFFENSE: WESTCHESTER |

SOUTHERN DISTRICT OF NEW YORK, ss.:

  GEORGE BURDZY, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

## COUNT ONE
### (Conspiracy to Distribute and Dispense Narcotics and Controlled Substances)

  1. From at least in or about January 2023 up to and including the date of this Complaint, in the Southern District of New York and elsewhere, MORDECHAI BAR, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

  2. It was a part and an object of the conspiracy that MORDECHAI BAR, the defendant, and others known and unknown, would and did distribute, dispense, possess with intent to distribute and dispense, and cause to be distributed and dispensed a controlled substance through prescriptions that were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice, in violation of Title 21, United States Code, Section 841(a)(1).

  3. The controlled substances involved in the offense were quantities of mixtures and substances containing a detectable amount of (i) oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C); (ii) amphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C); and (iii) alprazolam, a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(b)(2).

(Title 21, United States Code, Section 846.)

## COUNTS TWO THROUGH THIRTEEN
### (Distribution and Dispensation of Narcotics and Controlled Substances)

  4. On or about the dates set forth below, in the Southern District of New York and elsewhere, MORDECHAI BAR, the defendant, knowingly and intentionally distributed, dispensed, possessed with intent to distribute and dispense, and caused to be distributed and dispensed a controlled substance through prescriptions that were not issued for a legitimate medical purpose



by a practitioner acting within the usual course of professional practice, in violation of Title 21, United States Code, Section 841(a)(1), and aided and abetted the same.

5.    The controlled substances involved in the offenses, as set forth below, were quantities of mixtures and substances containing a detectable amount of (i) oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C); (ii) amphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C); and (iii) alprazolam, a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(b)(2).

| Count | Date | Controlled Substances Involved | Penalty Provisions |
| --- | --- | --- | --- |
| Two | Feb. 16, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Three | March 15, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Four | April 20, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Five | May 18, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Six | June 21, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Seven | July 19, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Eight | August 23, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Nine | Sept. 27, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Ten | Nov. 8, 2023 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Eleven | Jan. 10, 2024 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Twelve | Feb. 21, 2024 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |
| Thirteen | March 27, 2024 | Oxycodone; Amphetamine; Alprazolam | 21 U.S.C. § 841(b)(1)(C)&(b)(2) |

(Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(C)&(b)(2); Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.    I am a Special Agent with the DEA, and I have been personally involved in the investigation of this matter. This complaint is based in part upon my personal knowledge, training, and experience, conversations with other law-enforcement officers and others, my examination of correspondence, reports, records, and recordings, and my review of publicly available information and regulations. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my

investigation. Where the contents of documents or recordings and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## THE CONTROLLED SUBSTANCES ACT & DIVERSION PREVENTION

7. There are numerous federal and state rules and regulations that govern prescribing and dispensing controlled substances, including those designed to prevent illicit diversion of those substances. Through a review of publicly available records, statutes, and regulations, as well as discussions with other law enforcement officers, I have learned the following about those laws:

   a. The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States. Various prescription drugs are scheduled substances under the Controlled Substances Act. The DEA categorizes controlled substances into one of five schedules based on, among other things, their medical use, potential for abuse, and safety or dependence liability.

   b. Medical practitioners authorized to prescribe or dispense controlled substances by the jurisdiction in which they are licensed to practice medicine are authorized by the Controlled Substances Act to write prescriptions for or otherwise dispense controlled substances if they are registered with the Attorney General of the United States through the DEA. Such medical practitioners are authorized by the DEA pursuant to an application, and registrants are issued a unique registration number.

   c. Title 21, Code of Federal Regulations, Section 1306.04(a) provides, in part, that for a prescription for a controlled substance to be effective, it "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner." 21 C.F.R. § 1306.04(a).

   d. New York State has in place a prescription monitoring program (or "PMP"), which is overseen by the Bureau of Narcotics Enforcement (the "BNE"). Among other measures, the BNE maintains a registry of controlled substance prescriptions, which tracks various pieces of information, including the identities of the prescribing practitioner, dispensing pharmacy, and the patient. Pharmacies operating in New York are required to report prescription information after dispensing a controlled substance to a patient. The BNE registry is then used by both healthcare professionals and law enforcement officers to, among other things, identify possible instances of diversion. Indeed, physicians and pharmacists are expected to regularly check their patients against that registry to ensure that their patients are not engaging in behaviors that indicate that they are abusing or re-selling controlled substances (*e.g.*, receiving multiple prescriptions from different providers).

8. Through a review of publicly available medical information, as well as my training and experience, I know, among other things, the following about oxycodone, amphetamine, and alprazolam:

   a. Oxycodone, a Schedule II narcotic, is a highly addictive opioid analgesic that is used to treat severe and chronic pain conditions, such as post-operative pain, severe

back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses. Oxycodone is typically dispensed in tablet form, with dosages usually varying between 5mg and 80mg of oxycodone per tablet. Oxycodone tablets come in extended-release and immediate-release (or "IR") form. Immediate-release oxycodone is faster acting than the extended-release formulation, and so is typically the favored form for oxycodone abusers. While tablets can contain just oxycodone (referred to as oxycodone hydrochloride or "oxycodone HCl"), some will be a combination of oxycodone and acetaminophen (*i.e.*, Tylenol). These oxycodone-acetaminophen tablets are typically sold under the brand name Percocet. The dosage strength for oxycodone-acetaminophen tablets refers to the relative amounts of each substance in the tablet—for instance, a 10/325mg tablet contains approximately 10mg of oxycodone and 325mg of acetaminophen.

b. Amphetamine, a Schedule II stimulant, is typically used to treat attention deficit hyperactivity disorder. One common brand name drug containing amphetamine is Adderall, which is a combination of dextroamphetamine and amphetamine.

c. Alprazolam, a Schedule IV depressant, is a benzodiazepine drug that is commonly sold under the brand name Xanax. Alprazolam is typically used to treat anxiety or panic disorders.

d. Together, oxycodone, amphetamine, and alprazolam are sometimes referred to as the "Holy Trinity" drug cocktail by oxycodone abusers due to the substances' cumulative chemical effect. Of particular concern about this "Holy Trinity" is the combination of an opioid (oxycodone) and a benzodiazepine (alprazolam), as combining those substances together increases the risk of a fatal overdose.

e. As controlled substances, oxycodone, amphetamine, and alprazolam are available to the public only through prescriptions.

9. I have personally participated in the investigation and prosecution of other schemes to illegally divert controlled substances. Based on my experience during those investigations, as well as my training, I know the following about diversion schemes:

a. Oxycodone prescriptions are in high demand and have significant cash value to drug dealers. The street value of oxycodone depends on the number of milligrams of oxycodone in each tablet; in and around the New York City area, each milligram of oxycodone roughly translates to around $1 in street value. So, for example, a single 15mg oxycodone tablet would have a street value of around $15. Street prices for oxycodone can be even higher in other parts of the country.

b. Many diversion schemes involve certified medical providers—such as doctors—who, for a fee, will write medically unnecessary prescriptions for large quantities of oxycodone and other controlled substances. In such schemes, the medical provider typically charges cash for "medical visits" that involve little or no physical examination of the supposed "patient." Nonetheless, the medical provider will issue a prescription (or multiple prescriptions) to the "patient." In some instances, "patients" also pay the medical provider's employees (such as the office staff) in cash to facilitate access to the medical provider or to bypass the need to see the medical provider altogether.

## MORDECHAI BAR'S DIVERSION OF CONTROLLED SUBSTANCES

10.     MORDECHAI BAR, the defendant, is a physician that operates a medical practice in the vicinity of Huguenot Street, New Rochelle, New York. According to publicly available records maintained by the U.S. Centers for Medicare & Medicaid Services, BAR's specialty is internal medicine. As explained below, between at least in or about January 2023 and the date of this Complaint, BAR conspired with others to provide prescriptions not issued for a legitimate medical purpose for oxycodone, amphetamine, and alprazolam to patients in exchange for cash payments. BAR issued those prescriptions without conducting medical examinations of the patients and, in many cases, without even speaking to or meeting with the patients.

11.     During this investigation, a confidential source ("CS-1")[1] purchased these medically unnecessary prescriptions from MORDECHAI BAR, the defendant, in both CS-1's name and in the names of others.

### Bar Begins Selling Prescriptions to CS-1 Around 2012

12.     In or about November 2022, the DEA searched CS-1's home and found evidence that CS-1 was illegally distributing controlled substances. Since that time, CS-1 has been assisting the Government in this investigation. I have spoken to CS-1 about where he/she was getting the controlled substances that CS-1 had been distributing. Through those discussions, I learned, in substance and in part, the following about CS-1's relationship with MORDECHAI BAR, the defendant:

   a.     In or about 2012, CS-1 was told by one of his/her friends that the friend was getting prescriptions for controlled substances from BAR and the friend believed that BAR would also write prescriptions for CS-1. Thereafter, CS-1 accompanied his/her friend to BAR's office, and BAR wrote CS-1 prescriptions for oxycodone, amphetamine, and alprazolam—without performing any medical examinations or testing—in exchange for cash.

   b.     Since that time, CS-1 has regularly been visiting BAR and receiving prescriptions for oxycodone, amphetamine, and alprazolam. CS-1 could not recall BAR performing any medical examination or tests on him/her, with the exception that one of BAR's office employees may have taken CS-1's blood pressure a handful of times over the years, and BAR may have conducted a single urinalysis test with no follow up over the many years that CS-1 has been seeing BAR.

   c.     After the first few visits, CS-1 began having BAR write multiple prescriptions for him/her using two different surnames. Eventually, at CS-1's request, BAR also began writing prescriptions in the names of CS-1's parents. BAR ordinarily did not meet

---

[1] CS-1 has been assisting the Government since in or about December 2022, in the hopes that doing so will result in leniency for CS-1's own drug trafficking crimes. According to CS-1's criminal history records, CS-1 has two prior convictions in New York State for controlled substance crimes, one of which was subsequently vacated. CS-1 has also struggled with controlled substance addiction for years, including while assisting the Government. Information that CS-1 has provided to the Government has proven to be reliable and has been corroborated through, among other means, the audio and video recordings described herein, electronic prescription records, and electronically stored information extracted from CS-1's cellphone.

with or speak to CS-1's parents before doing so—he simply wrote the prescriptions after meeting with CS-1 alone.[2] BAR typically charged CS-1 approximately $100 in cash per name (*i.e.*, $100 for prescriptions in CS-1's name, $100 for prescriptions in the name of CS-1's mother, etc.). On occasion, BAR's office would send in prescriptions for CS-1 without BAR meeting with CS-1 beforehand. For those sales, CS-1 would pay approximately $100 to BAR's office staff on top of the typical $100-per-name price.

       d.      Although CS-1 abused some of the controlled substances that BAR prescribed to him/her, CS-1 re-sold the vast majority.

       e.      CS-1 indicated that even at the beginning of his/her relationship with BAR, CS-1 did not have a legitimate medical issue that would have required the large amount of oxycodone that BAR was prescribing to him/her. CS-1 was simply purchasing prescriptions for controlled substances to abuse and re-sell.

      13.      I have reviewed BNE prescription data for the period between in or about January 2019 and in or about December 2022. Through that review, I have learned that MORDECHAI BAR, the defendant, wrote prescriptions in the names of CS-1 and CS-1's parents nearly every month during that period. Those prescriptions were for oxycodone, amphetamine, and alprazolam.

### The Controlled Buys

      14.      Since CS-1 began working with law enforcement in or about late 2022, CS-1 has continued (at law enforcement's direction) to purchase prescriptions from MORDECHAI BAR, the defendant, in both CS-1's name and the names of CS-1's parents. In or about February 2023, CS-1 also began purchasing prescriptions in the name of "Nicole Gilbert." "Nicole Gilbert" is an undercover name used by a law enforcement officer—*i.e.*, it is not the officer's real name. Through my participation in this investigation, discussions with other law enforcement officers and CS-1, and a review of BNE data, I know that each prescription CS-1 purchased from BAR during this time was for the following controlled substances, in the approximate listed amounts:

| Person | Controlled Substance(s) |
|---|---|
| **CS-1** | • 300 tablets of oxycodone HCl (IR) 20mg<br>• 60 tablets of dextroamphetamine-amphetamine 30mg<br>• 90 tablets of alprazolam 2mg |
| **CS-1's Mother** | • 300 tablets of oxycodone HCl (IR) 20mg<br>• 60 tablets of dextroamphetamine-amphetamine 30mg<br>• 120 tablets of alprazolam 2mg |
| **CS-1's Father** | • 240 tablets of oxycodone-acetaminophen 10/325mg<br>• 60 tablets of dextroamphetamine-amphetamine 30mg<br>• 120 tablets of alprazolam 2mg |

---

[2] CS-1 recalled that his/her mother may have gone to BAR's office on approximately 15 occasions, and that his/her father may have gone to BAR's office on one occasion.

| "Nicole Gilbert" | • 90 to 120 tablets of oxycodone-acetaminophen 5/325mg[3] |
|---|---|

15.     On approximately twelve different days between in or about February 2023 and in or about April 2024, MORDECHAI BAR, the defendant, issued electronic prescriptions for controlled substances in the names of CS-1, CS-1's parents, and Nicole Gilbert. Before each meeting between BAR and CS-1, a law enforcement officer brought CS-1 to BAR's office in New Rochelle, gave CS-1 a recording device, waited in the vicinity until the deal was complete, and then met CS-1 immediately after he/she left BAR's office, at which point the recording device was recovered. As part of several of those sales, BAR's office staff collected additional cash payments from CS-1 for helping to facilitate the electronic submission of prescriptions without CS-1 meeting with BAR ahead of time. Based on my participation in this investigation, conversations with other law enforcement officers and others, and a review of law enforcement records and the audio/video recordings created by CS-1, I have learned the following about several of those sales:

   a.   **February 16, 2023:** On or about February 16, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately 10 minutes, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents, despite not meeting with or speaking to them. During the meeting, CS-1 also asked BAR to prescribe oxycodone to Nicole Gilbert, who CS-1 claimed was his/her friend. CS-1 then showed BAR a driver's license with Gilbert's information on it and promised BAR $200 in cash for writing the prescription.[4] BAR agreed and wrote a prescription for oxycodone-amphetamine tablets without meeting Gilbert:

CS-1:   Dr. Bar, I have a girlfriend of mine. She's a nice girl. I went to school with her. She's like 33 years old. Works construction, and her back's really bothering her. And she just wanted to know if, um, you could take her on as a patient. This is her, and she'd give you like $200 per visit. She just wants like 30 Percocet, 10mg. Do you think you could take her as a patient possibly?

BAR:    I don't know [*Unintelligible*].

CS-1:   Well, I had her drive me here today, and she said she'd give you $200 for the visit, so you let me know. She only wants like 30 Percocet. She's a nice girl. She works hard.

BAR:    Ya?

CS-1:   Ya.

BAR:    She's nice like you?

CS-1:   Just like me.

---

[3] As discussed below, Nicole Gilbert's initial prescription was for approximately 90 tablets, but that was increased to approximately 120 tablets in or about April 2023.

[4] The driver's license that CS-1 showed to MORDECHAI BAR, the defendant, is an "undercover" license bearing the name "Nicole Gilbert" and the undercover officer's photograph.

7

| | |
|---|---|
| BAR: | Better than you? |
| CS-1: | [*Laughing*] Better than me. Ya, but if you could do me that favor. You – I don't even need to make her come up. I could just give you the money, if you want to send it to QV for her.[5] |
| BAR: | What's her name? |
| CS-1: | Um, right here. It's Nicole Gilbert. |
| BAR: | [*Unintelligible*] get a piece of paper. . . . |
| . . . . | |
| BAR: | She has back pain? |
| CS-1: | Ya, she has such bad back pain. She was in a car accident, and she works for Local 731, the laborer's union, and she does, like, really back-breaking work or whatever. And she just needs – like, like, if you could give her 60 Percocet or whatever, that would be fine. |
| BAR: | Percocet. |
| CS-1: | 10mg, 325. |
| BAR: | No, I cannot start with 10. I'll give her 5. |
| CS-1: | 5mg? Okay, that's fine. . . . How many are you going to give her? |
| BAR: | 90. |

At the end of the meeting, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room—$300 for his/her typical prescriptions and an extra $200 for Gilbert's prescription.

    b.    **March 15, 2023:** On or about March 15, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately three minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them.[6] CS-1 even had to remind BAR of Gilbert's name so that he could fill out the prescription form:

---

[5] Based on my participation in this investigation, and a review of BNE records, I know that MORDECHAI BAR, the defendant, had previously sent prescriptions in the names of CS-1 and CS-1's parents to FK Pharmacy Inc. in Queens, which does business as a retail pharmacy under the name QV Pharmacy.

[6] Despite MORDECHAI BAR, the defendant, agreeing to write the prescription for Nicole Gilbert, that prescription does not appear in BNE data. And before CS-1 went to pick up the prescription from a pharmacy, he/she was told by the pharmacy that they did not have a prescription in Gilbert's name. CS-1 thereafter recorded a phone call with BAR on which he/she told BAR that BAR needed to reach out to the

| | |
|---|---|
| CS-1: | And then if you can write the 90, um, Percocet for my – for my friend. Remember, you did last time? |
| BAR: | Hmm. [*Unintelligible*] |
| CS-1: | If you want to see her, sh – she'll come, but – |
| . . . . | |
| BAR: | What's the name? |
| CS-1: | Nicole Marie Gilbert, is the last name. G-I-L-B-E-R-T. . . . |
| BAR: | Nicole? |
| CS-1: | Mhm. |
| BAR: | That's what I write on the prescription, yes? |
| CS-1: | Ya, Nicole. |
| BAR: | Okay. |

- In exchange for the various prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

    c.    **April 20, 2023:** On or about April 20, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately three minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them.



*Mordechai Bar at the April 20, 2023 sale*

---

pharmacy about the Gilbert prescription, and BAR agreed to do so. After that call, CS-1 was able to pick up the Gilbert prescription from the pharmacy.

During this meeting, CS-1 asked BAR to increase both the size and strength of Gilbert's prescription from 90 tablets of oxycodone-acetaminophen 5/325mg to 120 tablets of oxycodone-acetaminophen 10/325mg. BAR agreed to increase the prescription size, and a review of BNE records confirms that he upped Gilbert's prescription from 90 to 120 tablets from this day forward:

CS-1:   Can you do 120 instead of 90 for her, or no?

. . . .

BAR:    Okay, what's the name again?

CS-1:   Um, Nicole Gilbert.

. . . .

BAR:    What did I give her last time?

CS-1:   Um, 90 Percocet. Could you do like 120 instead? Of the 5mg.

BAR:    Percocet?

CS-1:   Ya.

. . .

BAR:    120, okay.

CS-1:   Thank you so much. Try to do the 10s if you could – the 10mg ones.

In exchange for the various prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

      d.     **May 18, 2023:** On or about May 18, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately two minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them. During the meeting, BAR asked CS-1 to confirm the prescriptions that CS-1 wanted before writing them:

BAR:    So you get the, uh, oxycodone.

CS-1:   Mhm.

BAR:    Adderall.

CS-1:   Mhm.

BAR:    And the Xanax.

CS-1:   Ya.

BAR:    Nicole?

CS-1:   Oxycodone 10.

10

| | |
|---|---|
| BAR: | She get, uh, Percocet, right? |
| CS-1: | Ya. |
| BAR: | Okay. [*Says CS-1's mother's first name*]. |
| CS-1: | Same as me. |
| BAR: | Oxycodone. Adderall. Xanax. |

In exchange for the prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

      e.      **June 21, 2023:** On or about June 21, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately three minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them. Near the end of the visit, CS-1 had to prompt BAR to write a prescription for Gilbert, which BAR agreed to do, but only after having to be reminded of Gilbert's name:

| | |
|---|---|
| CS-1: | Oh, and Nicole, too. Nicole Gilbert. The – for the – for the Percocet. Ya. |
| BAR: | [*Unintelligible*] piece of paper. |
| CS-1: | Oh, sorry. |
| . . . . | |
| BAR: | What's her name? |
| CS-1: | Nicole. N-I-C-O-L-E. |
| BAR: | Last name? |
| CS-1: | Gilbert. G-I-L-B-E-R-T. |
| BAR: | Okay, let me see what I give her, I don't remember. Percocet? |
| CS-1: | Percocet 10mg, I believe. Uh – |
| . . . . | |
| BAR: | Okay. |
| CS-1: | Okay. And that's for you. Thank you so much, Dr. Bar. |

In exchange for the prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

      f.      **July 19, 2023:** On or about July 19, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately two minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical

prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them.



*Mordechai Bar at the July 19, 2023 sale*

In exchange for the prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.[7]

       g.      **August 23, 2023:** On or about August 23, 2023, BAR wrote the typical prescriptions for CS-1, CS-1's parents, and Nicole Gilbert, without first meeting with or speaking to CS-1 (or the other people). Approximately a week later, on or about August 30, 2023, CS-1 went to BAR's office to pay him for the prescriptions. Although BAR was not there that day, CS-1 was greeted by one of BAR's employees, who told CS-1 that "Dr. Bar asked about the money . . . ." In exchange for the prescriptions, CS-1 paid the office employee approximately $500 in cash, plus an additional approximately $100 for the prescriptions being submitted without an in-person visit.

       h.      **September 27, 2023:** On or about September 27, 2023, CS-1 went to BAR's office for an appointment. When CS-1 arrived, one of the office workers told CS-1 that BAR had already left for the day, but the employee confirmed that BAR had already written the typical prescriptions in the names of CS-1, CS-1's parents, and Nicole Gilbert, without meeting with CS-1: "Everything's called in for you guys." In exchange for the prescriptions, CS-1 paid the office employee approximately $500 in cash, plus an additional approximately $100 for the prescriptions being submitted without an in-person visit.

---

[7] The prescriptions that MORDECHAI BAR, the defendant, wrote on or about July 19, 2023, are not reflected in BNE records. I have spoken to members of BNE, and I have learned, among other things, that one possible explanation for this is that the pharmacy to which the prescriptions were sent failed to verify some piece of required information. Regardless, I know that these prescriptions were dispensed to CS-1 on or about July 20, 2023, indicating that BAR did in fact submit these prescriptions.

    i.  **November 8, 2023:** On or about November 8, 2023, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately two minutes total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them. During the meeting, CS-1 reminded BAR that he/she was paying BAR several hundred dollars for the prescriptions, and confirmed that BAR was going to write a prescription in Gilbert's name: "You gonna write for my friend too? You gonna write for my friend too? I gave you 500 . . . ." In exchange for the prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

    j.  **January 10, 2024:** On or about January 10, 2024, CS-1 went to BAR's office for an appointment. BAR met with CS-1 for approximately one minute and thirty seconds total, during which time BAR performed no medical examinations or tests. Nevertheless, BAR wrote CS-1 his/her typical prescriptions for oxycodone, amphetamine, and alprazolam. BAR also wrote the typical prescriptions in the names of CS-1's parents and Nicole Gilbert, despite not meeting with or speaking to them. Similar to the visit on or about May 18, 2023, CS-1 told BAR the specific prescriptions that he/she wanted before BAR wrote them:

| | |
|---|---|
| CS-1: | Trifecta. I get the addys, oxys, xannies. |
| BAR: | Okay, the same thing. |
| CS-1: | Ya. |
| BAR: | [*Says CS-1's mother's first name*]. |
| CS-1: | The same thing. Oxy, addy, xanny. |
| . . . . | |
| BAR: | Your father? |
| CS-1: | Daddy does the Percocet, the xanny, and the addy. And Nicole gets the Percocet. |
| BAR: | Okay. |
| CS-1: | Alright, you have yourself a great day. |

In exchange for the prescriptions, CS-1 handed BAR approximately $500 in cash while the two were still in the examination room.

    k.  **February 21, 2024:** On or about February 21, 2024, BAR wrote the typical prescriptions for CS-1, CS-1's parents, and Nicole Gilbert, without first meeting with or speaking to CS-1 (or the other people). Approximately a week later, on or about February 27, 2024, CS-1 went to the vicinity of 177th Street and Tremont Avenue, Bronx, New York, where CS-1 met BAR's office employee. CS-1 paid the office employee approximately $500 in cash, plus an additional approximately $100 for BAR writing the prescription without an in-person visit.

l.      **March 27, 2024:** On or about March 27, 2024, BAR wrote the typical prescriptions for CS-1, CS-1's parents, and Nicole Gilbert, without first meeting with or speaking to CS-1 (or the other people). Approximately a week later, on or about April 3, 2024, CS-1 went to BAR's office and paid the office employee approximately $500 in cash, plus an additional approximately $100 for BAR writing the prescription without an in-person visit.

16.     In sum, between in or about February 2023 and in or about April 2024, based on meeting with CS-1—and only CS-1—for around 30 minutes total, and without performing any medical examinations or tests, MORDECHAI BAR, the defendant, prescribed thousands of tablets of oxycodone, amphetamine, and alprazolam in the names of CS-1, CS-1's parents, and "Nicole Gilbert." In exchange for those prescriptions, CS-1 paid BAR thousands of dollars in cash, most of which CS-1 handed directly to BAR while the two were in the examination room. Several hundred dollars of cash were also paid to BAR's office staff for submitting prescriptions without BAR meeting with CS-1 in advance.

17.     The circumstances surrounding the prescription sales discussed above indicate that MORDECHAI BAR, the defendant, was knowingly diverting controlled substances to CS-1. For instance, based on my training and experience in other diversion investigations, I know that it is atypical for a physician to (i) prescribe controlled substances—especially powerful opioids like oxycodone—to patients without meeting them in person and performing evaluations on them, such as regular urinalyses; (ii) prescribe a patient the "Holy Trinity" drug cocktail of oxycodone, amphetamine, and alprazolam given the health risks of mixing an opioid and a benzodiazepine, *see supra* ¶ 8(d), and the high instances of abuse of those drugs among oxycodone addicts; (iii) write similar prescriptions for large amounts of oxycodone to multiple members of the same family; and (iv) receive cash payments for prescriptions directly from patients, especially while still in the examination room. While each of those facts is, on its own, an indication that diversion is occurring, together they are strong evidence that the prescriptions that the physician is writing are not being issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice.

[*Remainder of the page intentionally left blank*]

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MORDECHAI BAR, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
GEORGE BURDZY
Special Agent
Drug Enforcement Administration

Sworn to before me this 30th day of May, 2024.

_____
THE HONORABLE JUDITH C. McCARTHY
United States Magistrate Judge
Southern District of New York

15